UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RICKEY MILLERMAN,                    )
                                     )
            Plaintiff,               )
                                     )
      vs.                            )          Case No. 4:05CV00963 AGF
                                     )
JO ANNE B. BARNHART,                 )
Commissioner of Social Security,     )
                                     )
            Defendant.               )


**<u>MEMORANDUM AND ORDER</u>**

        This action is before the Court for judicial review of the final decision of the

Commissioner of Social Security, denying Plaintiff Rickey Millerman's application for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42

U.S.C. §§ 1381-1384f.[1]  For the reasons set forth below, the Court will affirm the

decision of the Commissioner.

        Plaintiff, who was born on October 26, 1951, applied for SSI benefits on

September 10, 2001, alleging a disability onset date of August 14, 1999, due to severe

joint arthritis; bad back, knees, and ankles; and cramps and numbness in his fingers.  The

application was denied at the initial administrative level on December 18, 2001.

Following a hearing on November 26, 2002, an Administrative Law Judge ("ALJ") found

on July 11, 2003, that Plaintiff had a severe impairment of alcohol abuse resulting in

_____

        [1]     The parties have consented to the exercise of authority by the undersigned
United States Magistrate Judge under 28 U.S.C. § 636(c).

limitations in mental functioning, but that when this abuse was not considered, Plaintiff could return to his past work as a factory assembly worker, and was thus, not disabled. Tr. at 160-69. On November 22, 2003, the Appeals Council of the Social Security Administration, noting that there was no medical or psychological evidence in the record regarding the severity and effect of Plaintiff's alcohol abuse, remanded the case to the ALJ to develop the record on this issue and, if warranted, to obtain evidence from a Vocational Expert (VE). Tr. at 190-92.

A second hearing was held before another ALJ on June 29, 2004, at which Plaintiff and a VE testified. On November 15, 2004, the second ALJ found that although Plaintiff could not return to his past work, there were other available jobs that he could perform and so was not disabled. On May 5, 2005, the Appeals Council denied Plaintiff's request for review. Plaintiff has thus exhausted all administrative remedies and the November 15, 2004 decision of the ALJ stands as the final agency action.

Plaintiff argues that the ALJ failed to provide a legally sufficient rationale for his assessment that Plaintiff had the residual functional capacity ("RFC") to perform light work with some restrictions, erred in discounting Plaintiff's subjective complaints of symptoms, and erred in relying upon the VE's testimony which was based on a flawed RFC.

## **BACKGROUND**

### **Work History**

Plaintiff worked for several years as a laborer in construction, and as a

warehouseman.  His earnings record shows that he had no earnings in 1986, 1987, 1988, and 1990 through 1994.  The only years since 1988 in which he earned over $6,000 were 1989 (approximately $8,000), 1995 (approximately $9,000), and 1996 (approximately $13,000).  A little over $2,000 is reported as earnings in 1999, with no earnings reported thereafter.  Tr. at 51.

**Medical Record**

The medical record indicates that Plaintiff twisted/injured his left ankle in the 1970s while he was in the Navy.  X-rays of Plaintiff's left ankle dated August 10, 1994, revealed no evidence of fracture, dislocation, or other bone or joint pathology.  Tr. at 223-26.  On July 22, 2000, Plaintiff's mother and girlfriend brought him to a Veterans Administration (VA) hospital after he became upset and threatened to jump off a bridge.  He reported to a staff psychiatrist that he had injured his right foot about one year ago by jumping over a fence and landing on a brick, and had not been able to work since then, had not been able to receive any treatment for his foot, and had been turned down for disability benefits.  Plaintiff reported that his last physical exam was two or three months ago and that he had chronic pain in his knees and back for the past ten years, used a brace on his left ankle for the past several years, had Hepatitis C for three to four months, and had suffered a tar burn requiring skin grafts in 1993.  Plaintiff claimed that he drank only one six-pack of beer per month.

Musculoskeletal and neurological exams indicated pain in his ankles, feet, knees, back, and hands; stiffness in both hands; decreased range of motion in his hands and right

3

foot; a tremor in both hands; numbness in fingers; an impaired gait due to injury to his foot; full range of motion of his back; decreased motor strength in both wrists; decreased plantar flexion in the right ankle; swelling in the right foot; and no muscle pain, weakness or cramps.

On mental status exam, Plaintiff was described as having a hostile attitude, but he reported that his mood was "better." He exhibited logical thought process and denied suicidal ideation. It was noted that he had good concentration, fair recall, average intelligence, and fair insight and judgment. Tr. at 242-46.

Plaintiff was again seen at the VA hospital on September 18, 2000, for follow-up on his joint and low back pain. He reported that he was only able to walk for three blocks before having to stop because of left and right ankle pain. The pain in the left ankle was described as continuous and severe and Plaintiff reported that he was not able to work because of this pain. He also complained of back pain and numbness in both hands that occurred at times but not always. Plaintiff also complained of having a depressed mood with no suicidal ideation. Tr. at 111.

Treatment notes from October 19, 2000, by VA psychiatrist Mohinder Partap, M.D., reflect complaints of irritability and difficulty with sleeping secondary to pain. Plaintiff asked for more Celexa, which he had been given three months ago, with no refill since July 24, 2000, and Dr. Partap gave him a two month supply. Tr. at 111.

Plaintiff was again seen at the VA hospital on December 20, 2000, in follow-up for his joint pain and low back pain. Walking and activity were reported as limited because

of the joint pain. The left ankle injury from the 1970s was noted for which Plaintiff wore an ankle support due to chronic instability. On physical examination, it was noted that Plaintiff was unable to heel and toe walk, secondary to pain, and that he was tender diffusely at the ankles. Plaintiff was to follow up with physical therapy and to consult with orthopedics about surgery on the right ankle. Tr. at 109-10.

On January 19, 2001, Plaintiff was again seen by Dr. Partap, who noted that Plaintiff had been out of work since August 1999 with no income. Plaintiff indicated that he was not engaged in excessive drinking, consuming only 12 cans of beer per month, and that he was taking Celexa and Amitriptyline (anti-depressants). Tr. at 108.

A note dated May 27, 2001, documents a telephone conversation between Plaintiff and a telephone care nurse at the VA hospital. Plaintiff stated that he needed to be readmitted. Plaintiff's language was described as abusive and vulgar, and he hung up when the nurse told him he would have to clean up his language. Tr. at 108.

As noted above, Plaintiff filed the present application for SSI benefits on September 10, 2001, and in connection thereto, he was seen for a consultative physical examination by Dr. Saul Silvermintz, M.D., on November 20, 2001. Plaintiff's chief complaints were severe arthritis in his back, knees and ankles, and numbness in his fingers. Dr. Silvermintz noted that Plaintiff walked with a brace and cane. Plaintiff told Dr. Silvermintz that when he had worked, he would use the brace before and after work. Plaintiff also told Dr. Silvermintz that he was being treated for Hepatitis B, but Dr. Silvermintz did not believe this as Plaintiff had no Hepatitis B antibodies. Plaintiff

denied drinking any liquor since 1999, but Dr. Silvermintz noted Plaintiff's hospitalization in 2000 for acute alcoholism. Tr. at 112-13.

On physical examination, Plaintiff was noted not to be in any acute distress or discomfort. There was no localized tenderness or muscle spasms in his back. His four extremities were noted as normal except for persistent mild flexion of the third and fourth distal phalanges of the right hand due to degenerative joint disease. Plaintiff had some Heberden's nodes on his fingers but could make a fist very well and there was no weakness of strength and no difficulty using the hand. On musculoskeletal examination, Dr. Silvermintz noted that Plaintiff's gait was normal, although he could not walk on his toes and it hurt to walk on his heels. Plaintiff was able to get on and off the examination table without difficulty and had no difficulty moving about the room. His finger movement was good except somewhat tremulous, which "one would associate with chronic alcoholism." Plaintiff performed range-of-motion exercises without his brace and was able to walk without it. The neurological examination revealed no abnormalities. The clinical impression offered by Dr. Silvermintz was a history of degenerative joint disease of multiple joints, a history of alcohol abuse, and a history of "what sounded like depression." Tr. at 113-14.

Also on November 20, 2001, Plaintiff was seen for a psychological consultative exam by L. Lynn Mades, Ph.D. According to Dr. Mades, when she asked Plaintiff about a history of psychiatric problems, Plaintiff complained of depression, but was very vague regarding the nature and duration of his symptoms. Dr. Mades noted that Plaintiff

reported that he had been hospitalized on a psychiatric ward at the VA hospital for eight days the previous year, but Dr. Mades noted that the VA record indicted that Plaintiff had actually been hospitalized for alcohol abuse. Plaintiff reported that his use of alcohol was "far and in between," but he was vague as to actual usage. On mental status examination, Plaintiff was reported to be spontaneous, coherent, relevant, and logical. His mood was hostile. Plaintiff was oriented in all spheres, but his insight and judgment appeared to be "somewhat limited."

Plaintiff reported that he lived alone. He stated that he was not able to do household chores very easily and that family members helped with these chores and with grocery shopping, but that he did some cleaning and cooking. Dr. Mades found that Plaintiff's ability to relate appeared mildly impaired due to his hostility. She further indicated that Plaintiff was able to maintain adequate attention and concentration with appropriate persistence and pace. Dr. Mades diagnosed alcohol abuse, depressive disorder not otherwise specified (NOS), personality disorder NOS, mild psychosocial and environmental problems, and a current Global Assessment of Functioning ("GAF") score of 75.[2]

Dr. Mades stated that Plaintiff presented predominantly as hostile and irritable,

---

[2]     A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 41 to 50 reflect "serious" difficulties in social, occupational, or school functioning; scores of 51-60 indicate "moderate" difficulties in these areas; scores of 61-70 indicate "mild" difficulties.

rather than depressed. Plaintiff appeared to have had problems with this throughout his life and to have had a more recent and extensive history of alcohol use than he reported. Dr. Mades stated that the extent to which Plaintiff's alcohol use might be contributing to his complaints of depression was uncertain, and that it was likely that Plaintiff's underlying personality disturbance was a contributing factor of his anger and depression. Dr. Mades found no evidence from her examination of a psychological impairment that would prevent Plaintiff from engaging in sustained employment, and she stated that clinical findings suggested that Plaintiff was capable of performing at least simple manual tasks with limited interactions with others and to complete a normal work day without interruptions from a mental disorder on a sustained basis. Plaintiff's prognosis was guarded with continued substance use, and improved to fair with cessation of substance use and better compliance with psychiatric treatment. Tr. at 117-22.

A Psychiatric Review Technique Form was completed by Judith McGee, Ph.D., on December 14, 2001. Dr. McGee noted that there was insufficient evidence to determine Plaintiff's functional limitations due to his affective disorder, personality disorder, or substance addiction disorder. Tr. at 79-91.

On May 9, 2002, Plaintiff again saw Dr. Partap, who noted that Plaintiff was last seen in January 2001. Plaintiff complained of poor sleep and a depressed mood. He told Dr. Partap that he had been denied SSI benefits and was unemployed and being supported by his live-in girlfriend. Dr. Partap observed that Plaintiff's mood and affect were depressed and that Plaintiff complained of backache and walked with a limp. Dr. Partap

prescribed a sleep aid and an anti-depressant and advised Plaintiff to return in two months.  Tr. at 155.

On May 10, 2002, Plaintiff obtained a replacement cane at the VA hospital. Plaintiff was observed to use the cane incorrectly, and when corrective education was offered, he stated that he would not change his way because "it works."  Tr. at 154.

On October 18, 2002, Plaintiff was involuntarily admitted to the general psychiatric ward of the VA hospital, pursuant to a physician's statement that Plaintiff was mentally disordered and had been behaving in a physically and threatening manner, stating he would kill people.  Plaintiff was placed in restraints and medicated with Olanzapine (an anti-psychotic medication) due to his aggressive behavior.  He reported that he had been drinking heavily and he was placed on detoxification.  He was uncooperative with attempts to evaluate his mental and physical condition and complained about the VA and government turning down his disability application. Plaintiff was diagnosed with alcohol dependence/intoxication, psychotic disorder NOS, rule out personality disorder NOS, history of degenerative joint disease, history of Hepatitis C, and a current GAF of 10.  Tr. at 147-53.

Physical examination on October 19, 2002, revealed that Plaintiff's gait and reflexes were normal, and that there were no sensory or motor deficits.  Tr. at 137-38.  He was discharged on October 22, 2002, with a GAF of 50.  It was noted that Plaintiff had a long history of dependency on alcohol, a history of depression and degenerative joint disease, and had been reported in the past as having alcoholic psychosis.  Discharge

medications included Olanzapine, Etodolac (a non-steroid anti-inflammatory drug used for treating pain), Citalopram (an anti-depressant), and Amitriptyline.  Discharge instructions included follow up with his own psychiatrist and primary care provider, individual and group therapy, and attending Alcoholics Anonymous.  Tr. at 133, 233-34.

The above describes the medical record that was before the first ALJ who rendered a decision on Plaintiff's application for  benefits.  The new evidence that was before the second ALJ following remand by the Appeals Council, consisted of the report by Arthur Littleton, Ph.D., dated June 10, 2004, when Plaintiff was seen for a consultative psychological evaluation.  Dr. Littleton noted that Plaintiff's mood was down, affect variable, and attitude negative.  Plaintiff was able to engage in some spontaneous conversation and was able to understand and follow simple routine directions.  Dr. Littleton noted that gross and fine motor coordination were fine, but that Plaintiff had a problem with his left ankle which "greatly affected his ambulation."  Plaintiff described his health as "fair," with his chief complaints involving Hepatitis C and problems with his ankle.  Tr. at 210.

On mental status examination, Plaintiff appeared to be older than his stated age, and "somewhat infirmed" which caused him to use a cane and walk with a limp.  Dr. Littleton reported that Plaintiff was cooperative and compliant, but was "clearly angry and agitated," sad, despondent, and alienated from society in general.  Dr. Littleton noted that Plaintiff was able to express his thoughts and ideas adequately.  Plaintiff stated that at times he thought about jumping off a bridge.  Dr. Littleton noted that Plaintiff had been

treated at least twice at the VA hospital for depression the previous year. Plaintiff complained of sleeping problems, difficulty with appetite, tired feelings, and frequent crying episodes -- almost three times a week. Plaintiff blamed the VA for many of his problems. He had few interests and viewed himself as being worthless. He also stated that he was preoccupied with an incident in which he was burned with hot tar.

According to Dr. Littleton, Plaintiff appeared to have a very low frustration tolerance, would engage in threatening behavior, and was very impatient and easily confused by events that occurred in daily life. Memory was considered normal. Information reflected some confusion and Plaintiff revealed a limited understanding of number concepts and operations. In summary, Dr. Littleton opined that Plaintiff had major depressive disorder recurrent and an impulse control disorder NOS.

Dr. Littleton indicated that Plaintiff would have moderate restrictions in his ability to understand and remember short, simple instructions; understand, remember, and carry out detailed instructions; make judgments on simple work related decisions; and interact appropriately with the public. He would have marked impairment in his ability to interact with supervisors and co-workers, and respond appropriately to work pressures and changes at a usual work setting. Tr. at 210-14.

**Hearing of June 29, 2004**

At the hearing on June 29, 2004, Plaintiff testified that he lived alone, was 52 years old, 5 feet 7 inches tall, about 160 pounds, and had a tenth-grade education, with special education classes in math. Plaintiff testified that he could do basic addition and

subtraction and could read and write well enough to fill out a job application, although he needed assistance filling out the application for disability benefits. Petitioner testified that he had worked as a laborer, warehouseman, and truck loader.[3] When asked about his impairments, Plaintiff stated that he had bad arthritis in all his joints from "head to toe," that was bad in his hands and worst in his ankles and knees. Tr. at 280-86, 300-01.

Plaintiff's attorney commented that Plaintiff had a cane with him and was wearing an ankle brace and Plaintiff stated that he had been using these assistive devices since about 1978, when he injured his ankle, using them after working hours in the years that he worked. Plaintiff testified that due to his weak ankles, he could only stand about ten minutes at a time and walk about two blocks at a time. He stated that he could sit for about 45 minutes at a time and lift up to 20 pounds, and that if he stooped or bent down, he had trouble getting back up. Tr. at 286-89.

Plaintiff's attorney asked Plaintiff about scabs or sores that were visible on both of his forearms and one on his face, and Plaintiff stated, "this was from me, just my nerves, picking, scratching." Plaintiff thought the sores were related to his Hepatitis and he stated that he had to check this out at the VA hospital. He stated that he had not been to the VA hospital here for over a year because he has no patience to wait for four hours in the waiting room. When asked if he had a nervous condition or problems with depression, Plaintiff answered that he had been admitted to the VA hospital twice during the year

---

[3] This job was listed by Plaintiff as an "assembler" at a factory. Plaintiff's testimony indicated that what he did was load furniture parts, weighing 120 pounds, onto trucks.

prior to the previous year "for something mental," for one week each time, adding that what really bothered him was that he could not work anymore, stating, "I was used to having a life doing something, you know." Tr. at 289-291.

Upon further questioning, Plaintiff stated that he had crying spells about twice a month. He stated that he had had suicidal thoughts in the past, which was the reason for the two hospitalizations noted above. He admitted to having a drinking problem in his 20s, but denied to having one currently, stating that he only drank beer and only a few "every couple of weeks." Plaintiff also denied ever having injected street drugs and thought that he must have gotten his Hepatitis from alcohol abuse. Tr. at 292-94.

Plaintiff testified that on a typical day, he would watch TV and listen to the radio in his backyard. He testified that family members would come by about twice a week to take care of household chores. He testified that he cooked simple meals for himself, did his own laundry, and went grocery shopping, with his girlfriend driving him. Plaintiff testified that he had no source of income, that he received food stamps ($141 per month), and that family members paid his utilities and rent. He did not go to church or social groups and could no longer go hunting. Plaintiff testified that he had trouble sleeping due to dreams about the accident in which he had burned his back. Plaintiff stated that he was in the Navy from 1973 to 1976, and had received an honorable discharge. He also stated that he no longer had a driver's licence due to having driven without proof of insurance. Tr. at 295-99.

The VE testified that Plaintiff's past work was unskilled work at the medium and

heavy exertional levels.  The ALJ then asked the VE to consider a person with the same

vocational factors (age, education, and past work experience) as Plaintiff who had the

following limitations and abilities: diagnosis of alcohol abuse and depressive disorder

NOS and a GAF of 75; able to perform at least simple manual tasks with limited

interactions with others and to complete a normal workday.  The ALJ asked the VE

whether there were any jobs such an individual could perform.  The VE responded that

there were available jobs at the light unskilled level[4] that such an individual could

perform, such as laundry worker, cashier, assembly worker, cleaner, and hand packager.

The VE testified that each of these jobs existed in significant numbers in the regional

economy.  Tr. at 301-03.

**ALJ's Decision of November 15, 2004**

The ALJ summarized the medical record and held that Plaintiff had alcohol

dependency, degenerative joint disease, Hepatitis C, a depressive disorder, and a

personality disorder.  The ALJ found that these disorders were severe, but did not meet

the requirements of a disabling impairment listed in 20 C.F.R. Part 404, Subpart P,

Appendix 1.  Tr. at 19.  The ALJ turned to consider Plaintiff's RFC, to determine whether

Petitioner could perform his past work, and if not, other work that existed in the national

economy.  Noting that the credibility of Plaintiff's subjective complaints was to be

considered in light of the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th

---

[4]    The Court notes that although the ALJ's question to the VE did not specify at
what exertional level the hypothetical person could work, the VE limited his answer to
jobs at the light level.

Cir. 1984), the ALJ found that Plaintiff's allegations regarding his symptoms were not fully credible. Tr. at 15-20.

The ALJ considered each of Plaintiff's alleged impairments, beginning with Plaintiff's allegations about pain in his ankles. The ALJ found that Plaintiff's allegations of pain in his ankles were partially credible and that evidence indicated that Plaintiff had "some ankle problems" associated with prior injuries to both ankles, which would account for "some pain." The ALJ found, however, that the objective evidence did not support a finding that was limited by pain to the extent he alleged, i.e., to the extent that he could not stand for over ten minutes or walk more than two blocks. The ALJ stated that "comprehensive testing" and those who had examined Plaintiff did not identify an underlying basis for pain at the alleged level. Tr. at 20.

The ALJ pointed to the August 1994 x-rays which showed no fracture, dislocation, or other bone pathology; to Dr. Silvermintz's observations in November 2001 that Plaintiff's gait was normal, that he got on and off the examination table with no difficulty, and that he walked and performed range-of-motion exercises without a brace; and to the lack of evidence of treatment for a right ankle injury. Furthermore, Plaintiff's testimony that he was able to perform his past jobs, which consisted of medium to heavy lifting and considerable walking/standing, without wearing the brace, led the ALJ to conclude that Plaintiff's ankle impairment was not disabling. Tr. at 20-21.

The ALJ then discredited Plaintiff's allegations of back pain and found that this was not a severe impairment. The ALJ also found that Plaintiff's Hepatitis C was not a

severe impairment.  Tr. at 21-22.

The ALJ acknowledged that the record showed that Plaintiff had a depressive disorder and personality disorder which might impact his ability to perform certain work-related mental functions.  But the ALJ held that the evidence did not suggest that Plaintiff was so limited by these problems as to be precluded from all work activity.  The ALJ reviewed Dr. Mades's November 20, 2001 psychological evaluation of Plaintiff, noting her assessment that Plaintiff was able to maintain adequate attention, concentration, and pace and was capable of performing simple manual tasks with limited interactions with others, and her GAF assessment of 75.  The ALJ also surmised that "[t]he fact that [Plaintiff's] disorders have been classified NOS, also suggests that they are not severe." Tr. at 22.

The ALJ then stated that he gave little weight to Dr. Littleton's June 10, 2004 psychological evaluation "due to the apparent inconsistencies within Dr. Littleton's report and because it was inconsistent when contrasted with other more credible opinion[s], such as that of Dr. Mades."  Tr. at 22.  The ALJ stated that Dr. Littleton's representation that Plaintiff had been treated at the VA hospital at least twice in the previous year (2003) for depression was inconsistent with the VA medical records submitted to date, as these records did not provide any evidence of treatment for depression, or for any medical concern after October 2002.  The ALJ noted further that there was no evidence that Plaintiff had been prescribed any psychiatric medication or had sought ongoing psychiatric treatment.  Tr. at 23.

The ALJ found that a number of factors reduced Plaintiff's overall credibility and his allegations that his impairments were disabling: Plaintiff's "inability to be forthcoming about his use of alcohol" to Drs. Silvermintz and Mades; the lack of ongoing treatment, notably from November 2001 until October 2002, when he was admitted to the VA hospital detoxification ward, and after his discharge from the hospital on October 22, 2002, in combination with Plaintiff's failure to comply with recommended treatment, i.e., that he stop drinking; the VA determination that Plaintiff was ineligible for disability benefits; Plaintiff's daily activities, which included cooking, grocery shopping, and washing clothes; the lack of evidence that a physician had ever imposed any lifting/ walking/standing restrictions on Plaintiff; and Plaintiff's low and sporadic earnings record. Tr. at 23-24.

The ALJ concluded that Plaintiff had the physical RFC to perform work which involved occasional lifting of no more than 20 pounds, with no frequent lifting or carrying more than ten pounds; walking or standing approximately six hours, off and on, in an eight-hour workday, and intermittent sitting the rest of the time, or, if sitting occurred most of the time, some pushing and pulling of arm or leg controls. The ALJ noted that this coincided with the requirements of "light work," as defined by the Commissioner's regulations.[5] Tr. at 24.

_____

[5] "Light work" is defined in 20 C.F.R. § 404.1567(b) as work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of up to ten pounds; and that might require a good deal of walking or standing, or sitting most of the time with some pushing and pulling of arm or leg controls.

(continued...)

As to Plaintiff's mental RFC, the ALJ found that Plaintiff could understand, remember, and carry out at least repetitive, simple work instructions; and that he should be restricted to working in an environment that did not involve extensive contacts with the public or with co-workers and supervisors. Tr. at 24-25.

The ALJ found that Plaintiff could not return to his past relevant work because the exertional demands of this work exceeded his functional capabilities as assessed by the ALJ. The ALJ recognized that because Plaintiff's mental impairments limited Plaintiff's ability to perform the full range of light work, the burden was on the Commissioner to demonstrate that there was other work that Plaintiff could perform. The ALJ concluded that the VE's testimony met this burden and that accordingly, Plaintiff was not disabled.

## STANDARD OF REVIEW AND STATUTORY FRAMEWORK

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). This "entails 'a more scrutinizing analysis'" than the substantial evidence

---

[5](...continued)

Social Security Ruling (SSR) 83-10 elaborates that the full range of light work requires standing or walking, off and on, for a total of approximately six hours of an eight-hour work day, while sitting may occur intermittently during the remaining time; that the lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping; and that many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. 1983 WL 31251, at *6 (1983).

standard.  Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)).  The

court's review "is more than an examination of the record for the existence of substantial

evidence in support of the Commissioner's decision"; the court must "also take into

account whatever in the record fairly detracts from that decision."  Id.  Reversal is not

warranted, however, "'merely because substantial evidence would have supported an

opposite decision.'"  Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in

any substantial gainful activity which exists in the national economy, by reason of a

medically determinable impairment which has lasted or can be expected to last for not

less than 12 months.  42 U.S.C. § 423(d)(1)-(2).  The Commissioner has promulgated

regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation

process to determine disability.  The Commissioner begins by deciding whether the

claimant is engaged in substantial gainful activity.  If so, benefits are denied.  If not, the

Commissioner decides whether the claimant has a "severe" impairment or combination of

impairments.  A severe impairment is one which significantly limits a person's physical or

mental ability to do basic work activities, including physical functions, such as walking,

standing, or sitting; as well as mental functions, such as understanding, carrying out and

remembering simple instructions, and responding appropriately to supervision and co-

workers. 20 C.F.R. § 404.1521(b).

In evaluating the severity of mental impairments, the ALJ must make specific

findings as to the degree of limitation in each of the following functional areas:  activities

of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).

If the claimant's impairment is not severe, the claim is denied. If the impairment is severe, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in the Commissioner's regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is equivalent to one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is one that does not meet or equal a listed impairment, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work, if any. If the claimant has past relevant work and is able to perform it, he is not disabled. If he cannot perform his past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

Where a claimant can perform the full range of work in a particular category of work defined at 20 C.F.R. § 404.1567 (very heavy, heavy, medium, light, and sedentary), the Commissioner may rely upon the Guidelines to meet her burden at step five. Where a claimant cannot perform the full range of work in a particular category due to non-exertional impairments, such as pain or mental disorders, the Commissioner must present testimony by a vocational expert to meet her burden at step five. Baker v. Barnhart, 457

F.3d 882, 894-95 (8th Cir. 2006).

A VE's response to a hypothetical question that includes all of a claimant's impairments and limitations can constitute substantial evidence at step five to support a conclusion of no disability.  Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001).  The hypothetical question must capture "the concrete consequences of a plaintiff's deficiencies."  Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997).  The question need not include alleged limitations which the ALJ properly discredits.  Haggard v. Apfel, 175 F.3d 591, 594-95 (8th Cir. 1999).

Here, the ALJ concluded at step four that Plaintiff could not perform any past work.  At step five the ALJ concluded, based upon the VE's answers to the ALJ's questions, that Plaintiff was not under a disability, as that term is defined in the Social Security Act.

### DISCUSSION

### ALJ's RFC Assessment

Plaintiff argues that in assessing Plaintiff's RFC, the ALJ did not point to any medical evidence to support that conclusion that Plaintiff could perform work at the light exertional level.  Specifically, Plaintiff asserts that in "the only physical exam in the record" (presumably Dr. Silvermintz's exam of November 20, 2001), Plaintiff was noted to have difficulty with his back and ankles.  Plaintiff further argues that the ALJ improperly relied upon Dr. Mades' 2001 psychological evaluation, which found only limited functional limitations due to non-exertional problems, to discredit Dr. Littleton's

later report from 2004, which found moderate limitations due to such problems. Plaintiff reasons that as these two reports cover different time frames, there is no medical evidence in the record to call Dr. Littleton's findings into question for the time period they cover.

A disability claimant's RFC reflects what she can still do despite her limitations. 20 C.F.R. § 404.1545(a). The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (citation omitted). Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. at 1023. As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" Id. (quoting Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001). The ALJ is therefore required to consider at least some supporting evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Here, the Court first concludes that there is sufficient evidence supporting the ALJ's mental RFC assessments, as the ALJ was entitled to rely upon Dr. Mades's report of November 20, 2001. Dr. Mades arrived at her opinions not only upon her review of the records, but also upon her examination of Plaintiff. There is no evidence that Plaintiff's mental condition deteriorated in any long-term fashion after Dr. Mades offered

22

her opinion and before Dr. Littleton offered his. The record strongly suggests that Plaintiff's intervening hospital commitment in October 2002 was the result of alcohol abuse which exacerbated Plaintiff's mental problems for a short duration of time only. There is no evidence that after his discharge, his mental state was worse than when Dr. Mades examined him. Thus, it was for the ALJ to resolve the conflicts between the opinions of Dr. Mades and Dr. Littleton. See Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006) (it is the ALJ's task to resolve conflicts in the evidence); Tindell v. Barnhart, 444 F.3d 1002, 1005 (8th Cir. 2006) (same).

The ALJ's statement that a diagnosis of a psychiatric disorder as "NOS" indicates that the disorder is not severe is unsound. Nevertheless, the ALJ primarily relied upon Dr. Mades's assessment of Plaintiff's GAF as 75, and her assessment that Plaintiff could engage in sustained employment doing simple tasks, as long as he had limited interaction with others, restrictions which the ALJ factored into his RFC determination.

In sum, although there was evidence in the record regarding Plaintiff's depression and other mental impairments that might have led to a conclusion that Plaintiff was more limited than Dr. Mades suggested, the ALJ's decision to rely upon Dr. Mades's report was not outside the "zone of choice" available to the ALJ. See Hacker, 459 F.3d at 936; Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001) ("As long as substantial evidence in the record supports the Commissioner's decision, [the court] may not reverse it either because substantial evidence exists in the record that would have supported a contrary outcome or because [the court] would have decided the case differently.")

A somewhat closer question is presented with respect to the ALJ's physical RFC determination. As noted above, the ALJ found that Plaintiff could walk or stand approximately six hours, off and on, in an eight-hour workday. Dr. Silvermintz's report of November 20, 2001, found that Plaintiff's strength in his hands was normal, that his gait was normal, that he could get on and off the examination table and walk around the room with no difficulty, and that he walked and performed range-of-motion exercises without a brace. This is consistent with many requirements of light work. But it does not relate to the ability to walk and stand for any duration of time. As noted above, although the ALJ did not factor any exertional limitations into the question he posed to the VE, the VE, who had listened to all of the testimony, limited his answer to jobs in the light exertional level. Two of the unskilled jobs that the VE stated an individual with Plaintiff's vocational factors and a GAF of 75 could perform, and which existed in significant numbers in the regional economy (assembly worker and hand packager), would not require extensive standing and walking. See, e.g., Haynes v. Barnhart, 416 F.3d 621, 628 (7th Cir. 2005) (plaintiff who could perform light work, except that he could only stand and walk three to four hours in a workday, for only five to ten minutes at a time, was not disabled where VE testified that such an individual could be an assembler or packager); Wells v. Apfel, 2000 WL 1562845, at *3 (6th Cir. Oct. 12, 2000) (same where plaintiff could not stand for more than one-half hour at a time or walk for prolonged periods and VE testified he could be an assembler). Accordingly, although the matter is not free from doubt, the Court concludes that substantial evidence supported the

ALJ's decision that there were jobs in the national economy that Plaintiff could perform.

## ALJ's Evaluation of Plaintiff's Subjective Complaints

Plaintiff argues that the reasons offered by the ALJ for discrediting Plaintiff's subjective complaints of disabling symptoms were not valid. He argues that his daily activities were not incompatible with disability, that the VA hospital's treatment notes clearly indicate that Plaintiff had a significant history of left ankle pain for which he sought treatment and for which surgery was recommended. He also argues that the ALJ improperly relied upon Plaintiff's lack of treatment, without determining whether treatment would improve Plaintiff's condition. Plaintiff asserts that "as he has had the left ankle injury for quite a number of years, . . . it is questionable at this point whether any further treatment would assist in his ability to work." Br. at 16. Plaintiff also maintains that the ALJ did not insure that the record was fully and fairly developed, and that the ALJ surmised that Plaintiff was still abusing alcohol, whereas there was no evidence of such abuse.

In Polaski, 739 F.2d at 1322, cited by the ALJ, the Eighth Circuit held that the "absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." Id. The Court explained that in evaluating a claimant's subjective complaints of pain, an ALJ must also consider "observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the frequency, duration, and intensity of the pain; (3) precipitating and

aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5)

functional restrictions." Id.

After considering the Polaski factors, the ALJ must make express credibility

determinations and set forth the inconsistencies in the record that caused him to reject the

plaintiff's complaints. Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998). "If the ALJ

discredits a claimant's credibility and gives a good reason for doing so, [the court] will

defer to [his] judgment even if every factor is not discussed in depth." Dunahoo v. Apfel,

241 F.3d 1033, 1038 (8th Cir. 2001).

Here the ALJ relied upon valid factors to support his credibility determination,

factors which are supported by the record. For example, the ALJ noted Plaintiff's

sporadic and low earnings record, a relevant factor in an ALJ's credibility analysis. See,

e.g., Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005). In addition, as the ALJ noted,

although Plaintiff complained of chronic pain, he sought no treatment from November

2001 until October 2002, or after October 22, 2002. See Choate v. Barnhart, 457 F.3d

865, 872 (8th Cir. 2006) (a claimant's failure to seek treatment is properly considered by

the ALJ is evaluating Plaintiff's credibility). Plaintiff's statements to Dr. Silvermintz and

Mades about his then current alcohol use strongly appear to have been inaccurate, and

such inconsistent statements to medical professionals undermine a claimant's general

credibility. See Raney v. Barnhart, 396 F.3d 1007, 1011 (8th Cir. 2005). In sum, the ALJ

gave good reasons for discrediting Plaintiff's allegations of symptoms to the extent that

Plaintiff alleged that they precluded work activity.

## CONCLUSION

The ALJ's decision that Plaintiff is not disabled within the meaning of the Social Security Act is supported by substantial evidence.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed.

An appropriate Judgment shall accompany this Memorandum and Order.

_____

AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 27th day of September, 2006